**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

In re:                                    )
                                          )
Kossi L. Apedoh and                       )
Tomika T. Apedoh,                         )     Case No.:  09-01656-BGC-7
                                          )
                  Debtors.                )

Saleh A. Rowaid,                          )
                                          )
                  Plaintiff,              )
                                          )
vs.                                       )     A. P. No.:  09-00120
                                          )
Kossi L. Apedoh,                          )
                                          )
                  Defendant.              )

**MEMORANDUM OPINION**

The matter before the Court is the <u>Complaint to Determine Dischargeability of Debt and Objection to Discharge</u> filed on June 5, 2009, by the plaintiff Saleh A. Rowaid. After notice, a trial was held on July 8, 2010.  Appearing were Kossi Apedoh, the Debtor-defendant; Saleh Rowaid, the Plaintiff; George Ritchey, the attorney for the Plaintiff; and Samir Nagi, a witness.  The Debtor-defendant appeared pro se.  The matter was submitted on the arguments of counsel, and pleadings, exhibits, and the testimony of Mr. Apedoh, Mr. Rowaid, and Mr. Nagi.

**I.  Background**

The debtor filed the pending case on March 18, 2009.  He listed the plaintiff in his bankruptcy petition as a creditor holding an unsecured nonpriority contract claim for $30,000.

The plaintiff filed the pending complaint on June 5, 2009.  The sole count in the complaint is one under section 523(a)(2)(A) of the Bankruptcy Code.  The plaintiff contends that he gave the defendant $40,000 to be held in trust as earnest money on the purchase of a business.  He argues that the defendant procured that money by fraud.  As such, the plaintiff argues that the defendant owes this debt and that this debt is not dischargeable in this Chapter 7 case.

In response, the defendant contends that he earned the money the plaintiff considers a debt. In the alternative, he argues that if he has a debt to the plaintiff, that debt is dischargeable because he did not procure the money by fraud.

## II. The Plaintiff's Complaint

The pertinent parts of the plaintiff's complaint are:

3. On or about April 13, 2007, Plaintiff paid over to J.T.K. International, Inc. cashier's checks totaling $40,000.00 to be held in trust as earnest money for the Plaintiff's proposed purchase of a grocery business located in Gadsden, Alabama. Negotiations for the purchase of this grocery business were unsuccessful, and Plaintiff made a demand on Defendant for the return of earnest monies paid to J.T.K. International, Inc. The sum of $5,000.00 was paid to Plaintiff after demand was made upon Defendant. However, the remaining $35,000.00 paid by Plaintiff was not repaid.

4. On or about the 20th day of August, 2007, Defendant executed a Promissory Note for $35,000.00 to Plaintiff. A copy of this Promissory Note is attached hereto as Exhibit "A" and made a part hereof by reference.

5. Defendant has failed to pay the indebtedness owed to Plaintiff.

6. Plaintiff was induced by Defendant to place monies in trust, based on representations by Defendant that the monies he was paying was earnest money that would be refunded to him, if the purchase of the grocery business contemplated by Plaintiff did not proceed to a closing.

<u>COUNT I</u>

7. Plaintiff re-alleges paragraphs one through six of the Complaint as if fully set out herein.

8. Plaintiff, in response to fraudulent misrepresentations made by Defendant, paid to Defendant the sum of $35,000.00.

9. The sum of money owed to Plaintiff, however, is greater than the original money provided by Plaintiff, due to accruing interest allowed by law.

2

10.     The money was obtained from Plaintiff through false
        pretenses, false representations, or actual fraud by
        Defendant.

11.     For the reasons above, the amount owed by Defendant to
        Plaintiff is non-dischargeable pursuant to 11 U.S.C.
        § 523(a)(2)(a).

WHEREFORE, Plaintiff requests this Honorable Court to enter an Order
declaring the debt owed to Plaintiff by Defendant in the amount of
$35,000.00, plus accruing interest to be non-dischargeable under 11
U.S.C. § 523.

Complaint to Determine Dischargeability of Debt and Objection to Discharge at 1-3,
Docket No. 1.[1]

While the plaintiff's complaint does not allege what specific representations the
Court should find to be fraud, the evidence shows that there are four times during the
parties' interactions when the fraud the plaintiff alleges could have occurred. Those
are: (1) when the plaintiff gave the defendant $40,000; (2) when the parties agreed to
extend the time to process the plaintiff's loan application; (3) when the defendant
signed the promissory note; or (4) when the defendant gave the plaintiff an insufficient
check for $35,000.

The Court has analyzed each under the fraud standards in this Circuit to
determine whether any one of these four created a debt the defendant would owe the
plaintiff which would not be dischargeable.[2]

### III.  The Defendant's Answer

The pertinent parts of the defendant's answer are:

3.      On or about April 13, 2007, Plaintiff paid over to J.T.K.
        International, Inc. cashier's checks totaling $40,000.00 to be held in

_____

[1] All docket numbers refer to Adversary Proceeding No, 09-00120, not the debtor's
Chapter 13 bankruptcy case.

[2] The plaintiff's complaint is styled Complaint to Determine Dischargeability of Debt and
**Objection to Discharge**, (emphasis added); however, the plaintiff did not plead, argue, or
present any evidence to support an "objection to discharge" under 11 U.S.C. §727. Section 727
requires a court to grant a discharge unless certain circumstances exist. There is no evidence
in this proceeding that any of those circumstances exist. Consequently, the Court finds that the
"objection to discharge" part of the complaint, if there is one, is due to be overruled.

3

trust as earnest money for the Plaintiff's proposed purchase of a grocery business located in Gadsden, Alabama. The Plaintiff agreed to purchase the store for the amount of $690,000.00 upon financial approval. The Plaintiff rescinded the transaction after receiving approval from the financial institution. The Plaintiff refused to continue with the transaction after learning that the interest rate was above the rate quoted subject to credit approval. According to the agreement signed by the Plaintiff, SALEH ROWAID, the earnest money was forfeited due to breech [sic] of contract. This was explained to the Plaintiff at the time of the transaction.

4.    On or about the 20th day of August, 2007, the Plaintiff along with SAMIR NAGI, MOZEN KHADER and an unknown male entered the Defendant's office at J.T.K. International, Inc. demanding repayment of the earnest money. Arguments and threats of physical assault with weapons were made against the Defendant. A third party in the office building of J.T.K. International, Inc. over heard the threats and called the police to the scene. In fear of his life, the Defendant wrote a check in the sum of $5000.00 and executed a promissory note in the sum of $35,000.00. Upon arrival, OFFICER WASHINGTON, witnessed the transaction and escorted the Plaintiff out of the office. A copy of this Promissory Note is attached as Exhibit "A" of the Complaint of the Plaintiff made hereof by reference.

5.    The Defendant obtained Legal Counsel after the incident to determine the worthiness of the promissory note and the indebtedness owed to the Plaintiff.

6.    Plaintiff was told that the earnest money would be refunded only if terms and conditions were not met. All terms and conditions were met and the Plaintiff refused to proceed to a closing.

<u>ANSWER TO COUNT I</u>

7.    Defendant re-alleges paragraphs one through six of the Answer as if fully set out herein.

8.    Defendant received $40,000.00 in earnest funds for the purchase of a Gadsden grocery business under terms and conditions agreed upon by the Plaintiff.

9.    The sum of money owed to the Plaintiff was agreed upon under duress by the Defendant.

4

> 10. The money obtained from the Plaintiff was accepted in good faith as earnest money for the purchase of a business sold the Plaintiff.
>
> 11. For the reasons above, the amount owed to the Plaintiff by the Defendant is dischargeable.

Answer - Complaint to Determine Dischargeability of Debt and Objection to Discharge at 1-2, Docket No. 4.

## IV.  Applicable Law

### A.  Statute

The plaintiff's single count is based on section 523(a)(2)(A) of the Bankruptcy Code.  That section reads:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual defendant from any debt--
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the defendant's or an insider's financial condition;

11 U.S.C.A. § 523(a)(2)(A).

Section 523(a)(2)(A) makes non-dischargeable debts for money, property, services or credit obtained by a defendant by, "false pretenses, a false representation, or actual fraud, other than a statement respecting the defendant's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). To have a debt declared non-dischargeable pursuant to section 523(a)(2)(A), a creditor must prove, "the defendant made a false statement with the purpose and intention of deceiving the creditor; the creditor relied on such false statement; the creditor's reliance on the false statement was justifiably founded; and the creditor sustained damage as a result of the false statement." Fuller v. Johannessen (In re Johannessen), 76 F.3d 347, 350 (11th Cir.1996). A false statement made without knowledge of its truth or falsity, in reckless disregard of the truth, is treated the same under 523(a)(2)(A) as a false statement made with knowledge of its falsity, and will suffice equally to render the resulting debt non-dischargeable. "[R]eckless disregard for the truth or falsity of a statement constitutes a 'false representation' under § 523(a)(2)(A) of the Bankruptcy Code." Birmingham Trust Nat'l Bank v. Case, 755 F.2d 1474, 1476 (11th Cir.1985).

Under this standard, there are four factors the plaintiff must satisfy.  Those are:

5

1.	the defendant made a false statement with the purpose and intention of deceiving the creditor;

2.	the creditor relied on such false statement;

3.	the creditor's reliance on the false statement was justifiably founded; and

4.	the creditor sustained damage as a result of the false statement.

## B.  Burden of Proof

The burden is on the plaintiff to prove the elements of section 523(a)(2)(A) by a preponderance of the evidence. <u>Grogan v. Garner</u>, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)."Before any such burden can be satisfied in the first instance, the fact finder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." <u>Id</u>. at 622, 113 S.Ct. 2264.[3]

When applying this standard, courts must consider:

the Bankruptcy Code provides the debtor a general discharge of all debts which arose before the filing of the petition. 11 U.S.C. §§ 727, 1141. The Code provides certain exceptions to discharge of particular debts and that certain debts may be determined to be non-dischargeable. Section 523 of the Code governs the determination of the dischargeability of particular debts. 11 U.S.C. § 523. Any exception to the general discharge of a debtor's debts is strictly governed by the Code and construed narrowly in favor of the debtor and against the creditor requesting the determination, <u>Norwest Bank Nebraska, N.A. v. Tveten</u>, 848 F.2d 871 (8th Cir.1988).

<u>Matter of Case</u>, 937 F.2d 1014, 1024 (5th Cir. 1991).

## V.  Findings of Fact and Conclusions of Law

The debtor-defendant is a Hoover, Alabama businessman.  At the time of his contact with the plaintiff he operated J.T.K. International Business Brokerage, a

---

[3] In this Circuit, the per curiam opinion in <u>In re Wood</u>, Case No. 07-10828, 2007 WL 2376788, 245 Fed.Appx. 916, 917 (11th Cir. August 21, 2007) explains a creditor's burden of proof in a complaint to determine the dischargeability of a debt. It reads, "The objecting creditor bears the burden of proving the § 523(a) dischargeability exceptions by a preponderance of the evidence. <u>Grogan</u>, 498 U.S. at 291, 111 S.Ct. at 661." <u>Id</u>.  This unpublished decision is cited in accordance with Rules 36-2 and 36-3 of the Court of Appeals for the Eleventh Circuit.

company where he matched buyers seeking to purchase businesses with sellers. The plaintiff is a Fresno, California businessman. He owns or operates convenience type stores in California and other parts of the United States.

After meeting through an internet contact, the plaintiff and the defendant entered into an agreement where the defendant would assist the plaintiff in purchasing a grocery business in Gadsden, Alabama. During their association, they entered into numerous agreements and had extensive interactions with each other and the seller. Through these interactions, there was an offer to purchase agreement between the plaintiff and the seller. The plaintiff paid the defendant $40,000 during the process. When the purchase failed, the plaintiff sought return of the $40,000, contending that the defendant procured the $40,000 by fraud. The defendant contends he earned that money, but if he did not, that there was no fraud.[4]

Nineteen plaintiff's exhibits were introduced at trial. With accompanying testimony, these exhibits provide the evidence from which this Court has reached its findings of fact and conclusions of law.

**Exhibit 1 – J.T.K. International Business Brokerage-Buyer Registration Form**. This form is the defendant's record of a telephone call he received from the plaintiff on April 13, 2007. It is on J.T.K. International letterhead and includes the plaintiff's name, address, and contact information. The plaintiff testified that he learned about the defendant's services through the internet and contacted the defendant for help with the purchase of a business. Official Recording at 9:27.

**Exhibit 2 – J.T.K. International Business Brokerage-Prospective Purchaser Confidentiality and Financial Disclosure Agreement**. This form sets out the terms of an agreement between the defendant's company and the plaintiff where the parties agree to keep the information each receives confidential. The form is signed by the plaintiff and dated May 1, 2007. This copy is not signed by the defendant but he testified he signed a copy on the same date. Official Recording at 9:38.

**Exhibit 3 –  J.T.K. International Business Brokerage-Buyer Agency Authorization Agreement**. This form appoints the defendant's company, J.T.K. International as the plaintiff's agent to assist the plaintiff in purchasing property. This authorization provides that if certain conditions are met, the defendant would be entitled to a commission or finder's fee of $10,000. One important condition was that the defendant would be entitled to that commission if, "any business becomes subject to an agreement of sale...." Exhibit 3. The agreement did not require consummation of a sale for that specific commission to be earned.

---

[4] The plaintiff's native language is Arabic. The defendant's native language is French. Both are fluent in English. There is no direct evidence that the language differences caused any of the parties' misunderstandings.

Case 09-00120-BGC   Doc 21   Filed 03/28/11   Entered 03/28/11 11:01:21   Desc Main
Document    Page 7 of 23

The document is signed by both parties, although the defendant's signature appears to be electronic rather than by his hand. The document is not dated, but the defendant testified that it was signed at the same time as Exhibit 2. Official Recording at 9:36; 9:38.

As discussed below in regard to Exhibit 13, Exhibit 3 has a direct bearing on the plaintiff's contention that the $40,000 was "earnest money" which the defendant was to hold in trust. That portion of Exhibit 3 reads:

> All fees and/or commissions due Broker from Buyer pursuant to the terms hereof, shall be paid to Broker by Buyer via cashier's check, no later than at the close of escrow on any applicable transaction/s hereunder. Should an <u>escrow</u>, which had been opened as a result of a purchase offer and acceptance being duly executed by both Buyer and Seller, fail to close for any reason, then and in that event, any <u>earnest money</u> forfeited by Seller as a result thereof shall be split evenly between Buyer and Broker to a maximum of $___N/A___ to Broker.

Plaintiff's Exhibit 3 (emphasis added). This exhibit demonstrates that the parties did not intend for the earnest money provisions of that exhibit to apply to this transaction as they agreed that it would "N/A," that is <u>not apply</u> or be "<u>not applicable</u>." It is also important to note that this document was executed at the same time the plaintiff gave the defendant the $40,000, or at least before the parties mentioned (in Exhibit 13) that the money was earnest money or that the $40,000 would be refunded under certain conditions. See Exhibit 13.

**Exhibit 4 – Offer to Purchase**. The defendant found a business for the plaintiff to purchase as evidenced by Exhibit 4. This exhibit describes that business as "Wood Brothers Grocery." The form is printed, but the entries are hand written. The purchase price is listed as $825,000. Of that amount $660,000 was to be a purchase money mortgage; $165,000 was a down payment; $155,000 was the balance down due at closing; and $10,000 was the defendant's commission. Closing was set for June 15, 2007, at the office of the closing attorney. The offer provided that, "If the seller fails to accept this agreement by 6:00 o'clock PM May , 2007, then the buyer may revoke this agreement." Exhibit 4. The form is signed by the plaintiff and by Hobson E. Wood, on behalf of the seller. It is dated May 3, 2007.

Like Exhibit 3, this exhibit also relates to the plaintiff's "earnest money" argument. Paragraph 14 of Exhibit 4 includes the following, "Buyer agrees that if he should fail or refuse to complete this transaction after timely acceptance vy [sic] the Seller, then <u>any funds on deposit with broker</u> shall be forfeited and, at the broker's option, shall be split 50% to the Seller, and 50% to the Broker." Plaintiff's Exhibit 4 (emphasis added).

8

**Exhibit 5 – Amendment/Addendum to Offer to Purchase**. This form begins, "We accept all of the terms and conditions of the attached offer to purchase dated 5/03/07, on the business known as Wood Brothers Grocery except as follows:...." Exhibit 5. The amendment then lists 11 contingent terms. Those terms are all handwritten. The document is two pages. The plaintiff signed the first page with a handwritten date of "5/3/07." The plaintiff signed the second sheet as the purchaser. A signature reading Hobson E. Wood is signed below the plaintiff's signature. The plaintiff testified he signed the document. Official Recording at 9:40-9:41. Among other things, the sale was subject to financing, an important fact as Exhibits 8 and 14 demonstrate.

**Exhibit 6 – Commission Agreement**. This typed agreement is between the seller and Sprott Companies, LLC. The seller agrees to give Sprott a security interest in the purchase proceeds and a $75,000 commission for,"the successful sale of said business." Exhibit 6. The form is not dated other than "___ Day of May, 2007." There are signature spaces for the seller to sign and for a representative of Sprott but neither is executed. While the agreement is not signed, when considered in connection with Exhibit 7, it appears that the seller did enter into some arrangement with Sprott Companies.

**Exhibit 7 – Commission Sharing Agreement**. In Exhibit 7 the Sprott Companies agreed to share the commission it would earn from the successful sale of Wood Brothers Grocery equally with Steve Kay (who is not otherwise identified) and Kossi Apedoh, the defendant. This statement is dated May 3, 2007, and is signed by the managing member of Sprott Companies, LLC. That name is typed on the form as Ronald L. Spratt. The Court does not know if "Spratt" is correct or if it should be "Sprott."

**Exhibit 8 – Mortgage Loan Commitment**. The plaintiff is the applicant on this mortgage document and Home Solutions, Inc. is the lender.[5] The document provides a loan amount of $660,000 at 6.750% interest. It is signed by the plaintiff and has a prepared date of May 5, 2007. The originator of this loan was Christie Taylor who was entitled to a fee of 1%, or $8,250. The plaintiff testified that Ms. Taylor was the defendant's sister-in-law.[6] Official Recording at 9:50. This loan was not approved. A later loan with an interest rate of 11.750% was conditionally approved. See Exhibit 14.

---

[5] Exhibit 8 was admitted at trial with conditions. It referred to an attachment that was not part of the exhibit.

[6] The plaintiff implied that the relationship between the defendant and Ms. Taylor gave credence to the allegations of fraud. There was no evidence presented to suggest any collusion.

**Exhibit 9 – Bank of America Cashier's Check**.  This cashier's check for $5,000 was purchased by the plaintiff on April 18, 2007.[7]  It is payable to the plaintiff Saleh Rowaid.  The plaintiff testified that this check was drawn for him to pay Ms. Taylor.  He testified that at the beginning of this loan process he told Ms. Taylor that his credit was good, and he would not accept an interest rate of more than 6% to 7%.  He testified that she told him she would work on the loan from that point.  He paid Ms. Taylor the $5,000 to begin processing his loan.  He said Ms. Taylor filled out his loan application and he signed it.  That application was not introduced at trial, and  Ms. Taylor did not testify.  Official Recording at 9:44-9:47

**Exhibit 10 – Four $10,000 Bank of America Cashier's Checks**.  As listed early in this memorandum, the Court identified four events that might qualify as the representations the plaintiff contends support his fraud allegation.  This is the first of the four.

This exhibit, and the conversation the defendant had with the plaintiff about the checks that are represented here, appear to be the primary basis of the plaintiff's section 523(a)(2)(A) allegations.  This is the $40,000 the plaintiff paid the defendant and the money he claims as damages based on the defendant's alleged fraud.  The conversation the plaintiff relayed at trial appears to contain the representations the plaintiff contends the defendant made that were false with the intent to deceive and on which he relied to his damage.

In regard to that conversation, the plaintiff testified:

Plaintiff's Attorney: These are four money orders, $10,000 each, totaling $40,000.  Um, explain to me what happened with respect to these monies.

Mr. Rowaid: Well he told me because he gonna get that money, I mean, he's gonna get that money from some, from which is what we purchased.  I said, okay, fine.

Plaintiff's Attorney: When you say he, you're talking about Mr. Apedoh.

Mr. Rowaid: Yes.

Plaintiff's Attorney: Okay.

---

[7] The check was drawn five days after the defendant's internal note (Exhibit 1) supplies the date of the parties' first contact.  Those dates help place the time of the payment of the $40,000 in context.

Mr. Rowaid:         And I tell him okay, I'm ready to buy it.  I'm not coming from California to stay here and just look around and go back.  No.  I need to buy business, I don't want to waste my time.  And he said okay, I need $40,000.  And I said okay that's fine.  But the deal get through?  He said yes.  Sure it's gonna get through.  And that day we made, we set up appointment for to meet him and his sister-in-law _____, which is a girl she find a loan company.  And they had another person, his name Rand something, I don't know his last name.  I know Rand.  And one other guy, his name's Steve.  And we get together in that office and I made him the $40,000 cashed checks.  He signed the papers.  I think that paper you've got copy of it.

Plaintiff's Attorney:   But you gave these monies to Mr. Apedoh?

Mr. Rowaid:         Yes.

Official Recording at 9:53-9:56.

As the above confirms, the plaintiff gave the defendant the $40,000 on the representation by the defendant that the deal would go through.[8]  In that regard, the plaintiff testified further that in May 2007 he was still under the impression that his offer to purchase was going to be accepted by Wood Brothers.  Id. at 9:53.  He testified that he had other conversations with the defendant around that time.  Through his attorney's questioning he explained that in May they were moving toward closing the offer.  Id.

All four checks are dated April 13, 2007.  Exhibit 10.  The plaintiff testified that he gave the defendant the money when they signed the papers.  Id.  The papers he was referring to are apparently those represented by Exhibits 2, 3, 4, and 5, which were executed on either May 1, 2007 or May 3, 2007.[9]  Consequently, the Court must conclude that the plaintiff's conversation with the defendant regarding the $40,000 and the defendant's representation that the deal would go through occurred near April 13, 2007.[10]  The delivery of the $40,000 occurred later when the parties met in May to begin the process.

---

[8] It is important to remember, the defendant's contention is that his commission, if the deal was completed, would be $40,000.  While the plaintiff did not explain the details, Exhibits 3, 6, and 7 confirm that the defendant would be entitled to some commissions on this transaction.

[9] While Exhibit 2 has a date of May 1, 2007, all of the other documentary evidence and the testimony indicate that the parties met on May 3, 2007, as Exhibits 4 and 5 show.

[10] This conclusion is supported by both Exhibit 1, which is the defendant's record of a telephone call he received from the plaintiff on April 13, 2007, and by the fact that the checks are dated April 13, 2007.

The evidence shows that the plaintiff gave the defendant $40,000 based only on the defendant's assurance that the sale would go through. The defendant's testimony offers some explanation. The defendant testified that the $40,000 included $10,000 that he contends he was owed for finding a business for the plaintiff to purchase, regardless of whether that sale was completed. Official Recording at 10:53; 11:02-11:03. Also see Exhibit 3. The defendant also testified that the remaining funds were those he contends he would be entitled to as additional commissions when the sale closed. Id. He argued that he wanted those additional funds in his possession because he would not be at the closing. Id. The plaintiff did not object and gave the defendant the money.

The plaintiff did not testify to a specific date when he gave the defendant the $40,000, but based on the other testimony and the exhibits, the Court is convinced the transaction occurred on May 3, 2007. See note 9 above. Other than the parties' meeting with Christie Taylor to discuss the loan, the only time, prior to the events surrounding Exhibit 15, the parties were together and signed papers was on May 3, 2007. The plaintiff testified that he gave the defendant the $40,000 at the same time they met and signed the papers. He also testified that at that time they also set up an appointment with Christie Taylor, the loan officer. Therefore, even if the money was not paid on May 3, 2007, it must have been paid before any meeting about the loan.[11]

Consequently, at this time there was a signed offer (Exhibit 4), a proposed closing date (Exhibit 4), and requirements on the plaintiff that he procure a loan (Exhibit 5). And the plaintiff had given the defendant $40,000 based on the representation from their earlier conversation that the sale would go through.

As seen later, the sale did not go through because the plaintiff did not get the loan interest rate he desired. The plaintiff implies that the loan did not go through because of the defendant's relationship with the loan officer, his sister-in-law. The plaintiff suggests that this supports his contention that there was fraud. In contrast, there is no evidence that the defendant did anything to torpedo the loan.

As explained above, for the plaintiff to be successful he must prove: (1) the defendant made a false statement with the purpose and intention of deceiving the creditor; (2) the creditor relied on such false statement; (3) the creditor's reliance on the false statement was justifiably founded; and (4) the creditor sustained damage as a result of the false statement.

---

[11] The complaint states that the $40,000 was paid on or about April 13, 2007. That could not be correct. The defendant and plaintiff did not talk until April 13, 2007, as evidenced by Exhibit 1, and the checks are dated April 13, 2007. In contrast, the defendant testified that the payment was made in May 2007. Official Recording at 11:01. That date would correspond with the parties May 3, 2007, meeting to sign the papers to start the purchase process.

Based on the evidence, the Court finds that the plaintiff did not prove these elements. There is no evidence that when the defendant made the representation that the sale would go through, (the only representation the plaintiff testified to as being the reason he gave the defendant the $40,000), that this representation was false or that the defendant intentionally made the statement to mislead the plaintiff. Consequently, there is no, "false statement with the purpose and intention of deceiving the creditor." If there is no false statement, then there cannot be reliance and damage.

In contrast, there is evidence that supports the conclusion that the defendant did believe that the sale would go through, and that his representation was true. The plaintiff specifically testified that he gave the defendant the $40,000 in May 2007. Official Recording at 9:53-9:54. He also testified that he was under the assumption that the sale would go through. Id. It was early in the process. The parties had just signed their agreements. The plaintiff and the buyer had just entered into the proposed sale. There is no reason to assume there was a problem at this point. And there certainly is no evidence that there was. It was not until June 2007 when there were issues regarding the plaintiff's loan that any problem arose.

Therefore, based on the above, as a matter of fact and as a conclusion of law, the Court must find that at the time the defendant asked the plaintiff for the $40,000, and at the time the plaintiff gave the defendant the $40,000 based on the defendant's representation that the sale would go through, the defendant believed that the sale would go through. Therefore, as to the representation associated with the payment of the $40,000, the plaintiff did not prove the defendant made a false statement with the purpose and intention of deceiving the creditor. Consequently there was no fraud in regard to this representation.

**Exhibit 11 – Amendment to Purchase Agreement**. Other than its title and a few procedural lines, this document is a handwritten modification of the plaintiff's offer to purchase the business. (The purchase agreement is contained in Exhibit 4). This agreement is between the plaintiff and Hobson Wood, the seller, although the seller is listed (in handwriting) only as Hobson Eugen. The seller's last name is not included. The document is dated May 21, 2007. It modifies the purchase agreement as to inventory, assistance after the purchase, and certain rights to cancel the transaction unrelated to the issues before this Court. The document contains the initials of the plaintiff and Mr. Wood. The plaintiff testified that the defendant wrote the document. Official Recording at 9:57.

**Exhibit 12 – Amendment to Purchase Agreement**. This is a second amendment to the plaintiff's offer to purchase the business. It is completely handwritten and reads:

13

Amendment to Purchase Agreement

It is hereby agreed by Mr. Hobson E. Wood Seller of Wood's Brothers Grocery to extend the purchase agreement from 6-15 to 7-15 2007.

Seller          <u>Hobson E Wood</u>

Witness       <u>Kossi L Apedoh</u>    Broker

Plaintiff's Exhibit 12.[12]  The document is dated at the top, also in handwriting, as "06/14/2007".  See also plaintiff's testimony on the Official Recording at 9:58.

**Exhibit 13 – Loan Application Status**.  As stated early in this memorandum, the Court identified four events that might qualify as the representations the plaintiff contends support his fraud allegation.  The first was the representation about the sale at the time the plaintiff gave the defendant the $40,000.  That event is discussed above.  This is the second of the four.

This document is not titled.  The characterization is the Court's.  The document reads:

J.T.K. INTERNATIONAL, INC.

I, Saleh Ali Rowaid, herein allow J.T.K. International Business Brokerage and its assossiates [sic] an extension of 4 (four) days effective as of June 22 to advise me as of my loan status,  If buy [sic] Tuesday June 26th noon no updates are made on my m transaction, I will no longer pursuit with the transaction and will be entitled my full 40,000 earnest funds back.

Agreed By:

Buyer:  <u>Saleh Rowaid</u>                    Broker: <u>Kossi Apedoh</u>

Plaintiff's Exhibit 13.  The plaintiff testified that this completely handwritten document was prepared by the defendant and both signed it.  Official Recording at 9:59-10:00.

Because this event was not specifically alleged in the complaint as a "false representation" qualifying under section 523(a)(2)(A), the Court must ask first: What are the specific representations the plaintiff contends were made by the defendant that the

---

[12] The debtor's signature is not legible, but it does match the signature he submitted on his Official Bankruptcy Form B21.

14

plaintiff contends were false and misleading?  The plaintiff's complaint reads in pertinent part:

> Plaintiff was induced by Defendant to place monies in trust, based on representations by Defendant that the monies he was paying was earnest money that would be refunded to him, if the purchase of the grocery business contemplated by Plaintiff did not proceed to a closing.

Complaint at 2, Docket No. 1.  Clearly Exhibit 13 was entered long after the plaintiff gave the defendant the $40,000.  Consequently, it could not have been the representation on which the plaintiff relied at the time he gave the defendant the $40,000 damage.[13]  But is the plaintiff contending that Exhibit 13 demonstrates a separate false representation to deceive him and which he relied on later and was then damaged?

The representation in Exhibit 13 is that if certain things do not occur, the plaintiff will be entitled to a refund of what the document characterizes as the $40,000 "earnest funds."[14]  Does that create a separate argument for the plaintiff?  The answer is no.

───────────────

[13] As discussed above in regard to Exhibit 3, at the time the parties entered into their Brokerage-Buyer Agency Authorization Agreement they did not intend for the "earnest money" provision of that agreement to apply.

[14] The injection by the parties of the concept of "earnest" money at this time raises an interesting question.  Is it that the plaintiff contends that the defendant was a fiduciary and that Exhibit 13 creates a separate cause of action under section 523(a)(4) of the Bankruptcy Code. To answer that question, Exhibit 13 needs to be viewed in its proper time frame.

As the quotes from the plaintiff's complaint and the defendant's answer demonstrate, both described the $40,000 as earnest money.  In contrast to their descriptions, as far as the Court can determine, Exhibit 13 is the first exhibit admitted into evidence to specifically mention "earnest" money, other than those documents the Court identified as not applying to the $40,000.  Similarly, there is no testimony that either party initially considered the $40,000 as earnest money, and there are no documents creating such a relationship between the parties. Unfortunately, Exhibit 13 is not dated, but because of the dates and events it refers to, it is clear that it was entered well after the May 3, 2007, meeting where the parties signed the original documents, and when the plaintiff gave the defendant the $40,000.  Based on these facts, the Court concludes that there is no evidence prior to this point that the parties considered the $40,000 as "earnest money."

How then does this relate to the allegations of fraud?  It does not.  Even if the defendant accepted the funds as "earnest money" and the parties considered the funds as such, the key is not what label the parties placed on the money.  This is particularly true where as here, the funds the parties are describing as earnest money were nothing of the sort.  Both parties understood that the funds represented the commissions the defendant would have received if the sale had been completed, not earnest money. Official Recording at 9:54 (Plaintiff's

15

As explained above, for the plaintiff to be successful he must prove: (1) the defendant made a false statement with the purpose and intention of deceiving the creditor; (2) the creditor relied on such false statement; (3) the creditor's reliance on the false statement was justifiably founded; and (4) the creditor sustained damage as a result of the false statement.

In regards to Exhibit 13, the Court finds that the plaintiff did not satisfy these elements. Aside from the fact that there is absolutely no evidence that the representations in this document are false, even if there were and the plaintiff reasonably relied on them, what damages could the plaintiff have suffered because of the false representation? Similarly, what is it that the plaintiff gave up in reliance on the representation? At the point when the parties signed this document, the plaintiff had already given the defendant the $40,000. There was no new debt created.

Therefore, based on the above, as a matter of fact, and as a conclusion of law, the Court must conclude that at the time the parties executed this document, there was no false representation on which the plaintiff could reasonably rely that would cause him damage. Consequently there was no fraud in regard to this representation.

**Exhibit 14 – Conditional Loan Approval.** This document is three printed pages representing the transaction between the plaintiff and Velocity Commercial Capital regarding a loan for the purchase of the grocery. It is dated June 20, 2007. It is not signed. The amount is $618,750. The interest rate is 11.750%.

--------

Testimony); Official Recording at 11:02 (Defendant's Testimony). Earnest money is quite different. It is, "A deposit paid (usu. in escrow) by a prospective buyer (esp. of real estate) to show a good-faith intention to complete the transaction and ordinarily forfeited if the buyer defaults." Black's Law Dictionary 525-26 (7th ed. 1999). The key here is what the defendant represented to the plaintiff that caused the plaintiff to give the funds to the defendant, not how the parties described the funds sometime later.

What then is the answer to the question: Is it that the plaintiff contends that the defendant was a fiduciary and that Exhibit 13 creates a separate cause of action under section 523(a)(4) of the Bankruptcy Code. First, the plaintiff does not allege in his complaint that the defendant's debt to him is nondischargeable under Bankruptcy Code section 523(a)(4). That section reads, a debtor is not discharged from a debt, "for fraud or defalcation while acting in a fiduciary capacity, or embezzlement, or larceny." 11 U.S.C.A. § 523(a)(4). No evidence was presented and no legal arguments were presented to explain if or how such a relationship was created between these parties. As quoted above, Exhibit 13 was created long after the funds were given to the defendant. How can this Court know if that was what was intended when the funds were delivered? Surely this Court is not required to scour the record to identify causes of action for the plaintiff and then determine whether those causes were proven or defeated by the defendant? It is universally recognized in dischargeability proceedings that, "exceptions to dischargeability should be construed in favor of the debtor." In re Cavalli, Adv. Pro. No. 08-6338, 2009 WL 3125549 at *2 (Bkrtcy. N.D. Ga. March 20, 2009) (citing In re Hunter, 780 F.2d 1577 (11th Cir.1986)). Second, if the plaintiff contends a cause of action under section 523(a)(4), the Court finds that he did not prove it.

This document relates to Exhibit 8 which is the Mortgage Loan Commitment application from the plaintiff to Home Solutions, Inc. for $660,000 at 6.750%.

As stated earlier, the plaintiff testified, in regard to Exhibit 8, that he believed he had good credit and would not accept any loan with an interest rate above 6% to 7%. Official Recording at 9:43-9: 46. Because this loan had the rate of 11.750%, the plaintiff rejected it. Official Recording at 10:01. The defendant's position is that when the plaintiff refused the loan, the plaintiff breached his agreements with the defendant and the seller.

Neither the loan mentioned in Exhibit 8 nor the one in Exhibit 14 was completed.

**Exhibit 15 – "Promissory Note."** Again, as mentioned above, the Court identified four events that might qualify as the representations the plaintiff contends support his fraud allegation. The first was the representation about the sale at the time the plaintiff gave the defendant the $40,000. The second was described above in Exhibit 13. This exhibit represents the third of the four.

This exhibit is not titled. The title is the Court's description. Exhibit 15 reads:

I, Kossi Apedoh, acknowlege [sic] owing Mr. Saleh A. Rowaid the sum of $35,000. I agree to pay these funds by the 20th of August 2007. Should i be unable to honor such payment, I agree to keep ~~the~~ Mr. Rowaid inform. Further, i agree to ~~not~~ cover any expenses should Mr. Saleh travel back to Alabama for any matter due to the collection of these funds.

Saleh A. Rowaid                                          Kossi Apedoh
/s/Saleh Rowaid                                          /s/Kossi Apedoh

Officer Washington                                      Samir Nagi
/s/Officer Washington                                  Samir Nagi

Plaintiff's Exhibit 15. There is one other witness signature in the margin of the document:

Mazen Khader
/s/Mazen Khader

Id.

As is evident, the document is a promissory note of sorts where the defendant agrees that he owes the plaintiff $35,000. Both parties, and a third witness, testified extensively about this document and the events surrounding it. The defendant testified

17

that he signed this document under duress.[15]  He stated that the plaintiff and other gentlemen came to his office to collect the $40,000.  Official Recording at 10:31.  He testified that he was threatened with harm if he did not repay the money.  He stated that he signed Exhibit 15, gave the plaintiff $5,000 in cash, and gave the plaintiff a post-dated check for $35,000, all to "get rid" of them because he was fearful. Id. at 10:31-10:32.

The plaintiff testified that he and some others did go to collect the funds, but they did not threaten the defendant. Official Recording at 10:06-10:07.  A third witness, Mr. Samir Nagi, testified.  He accompanied the plaintiff to the defendant's office.  His testimony supported the plaintiff's.  Official Recording at 10:41-10:44.

Like Exhibit 13, this exhibit raises the question:  Is the plaintiff contending that this exhibit shows a separate false representation with the intent to deceive and one on which he relied and was then damaged?  If the plaintiff is so contending, the Court finds again that this "representation" was not a false one that meets the four criteria for proving fraud under section 523(a)(2)(A).

First, again there is absolutely no evidence that the representations made in this document were false.  Second, the plaintiff had already given the defendant the $40,000.  The note did not cause the plaintiff to take any action in reliance on the note.  The note did not create a new debt.  The note did not cause the plaintiff any additional damage.  To the contrary, when the defendant signed the note, he gave the plaintiff $5,000 in cash.[16]

---

[15] As quoted above, the defendant's answer includes:

On or about the 20th day of August, 2007, the Plaintiff along with SAMIR NAGI, MOZEN KHADER and an unknown male entered the Defendant's office at J.T.K. International, Inc. demanding repayment of the earnest money.  Arguments and threats of physical assault with weapons were made against the Defendant.  A third party in the office building of J.T.K. International, Inc. over heard the threats and called the police to the scene.  In fear of his life, the Defendant wrote a check in the sum of $5000.00 and executed a promissory note in the sum of $35,000.00.  Upon arrival, OFFICER WASHINGTON, witnessed the transaction and escorted the Plaintiff out of the office.  A copy of this Promissory Note is attached as Exhibit "A" of the Complaint of the Plaintiff made hereof by reference.

Answer at 2, Docket No. 4.

[16] Because the Court finds that any debt the defendant owes the plaintiff is discharged, the Court has not discussed the defendant's "duress" defense.

18

Therefore, based on the above, as a matter of fact, and as a conclusion of law, the Court must find there was no false representation in the promissory note on which the plaintiff could reasonable rely that would cause him damage. Consequently there was no fraud in regard to this representation.

**Exhibit 16 – J.T.K. International, Inc. Check**. Again, as mentioned above, the Court identified four events that might qualify as the representations the plaintiff contends support his fraud allegation. The first was the representation about the sale at the time the plaintiff gave the defendant the $40,000. The second was described above in Exhibit 13. The third was the defendant signing the promissory note. This exhibit is the fourth of the four.

This document is a copy of a the post-dated $35,000 check the defendant gave the plaintiff when the plaintiff attempted to collect the funds at the defendant's office. The plaintiff testified that the check was returned because of insufficient funds. Official Recording at 10:08.

Like Exhibits 13 and 15, this exhibit raises the question: Is the plaintiff contending that this exhibit shows a separate false representation with the intent to deceive him and one on which he relied was then damaged? If the plaintiff is so contending, the Court finds again that this "representation" was not a false one that meets the four criteria for proving fraud under section 523(a)(2)(A).

First, it is generally recognized that the mere presentation of a check is not a representation that there are funds to support the check. The court in In re Brzakala, 305 B.R. 705 (Bankr. N.D. Ill. 2004) explains:

> The bad check claim under section 523(a)(2)(A) fails for two reasons. First, a section 523(a)(2)(A) claim requires a false representation of fact, Michel, 220 B.R. at 605, and again a check "is not a factual assertion at all," true or false, Williams, 458 U.S. at 284, 102 S.Ct. 3088 (1982). A check is simply an instruction to a bank to pay the face amount of the check to the bearer. Id. Citing Williams, the Seventh Circuit held more than a decade ago that a bad check is not a misrepresentation for purposes of section 523(a)(2)(A), see Goldberg Sec., Inc. v. Scarlata (In re Scarlata), 979 F.2d 521, 525 (7th Cir.1992), a proposition that by now is well-established, see Mega Marts, Inc. v. Trevisan (In re Trevisan), 300 B.R. 708, 716-17 (Bankr.E.D.Wis.2003); but see Bryson, 187 B.R. at 959-60 (noting split of authority on the question.)

Id. at 710.

There are cases that disagree as noted in the quote, but it appears that in this Circuit, courts follow this general proposition. In United States v. Blankenship, 382 F.3d 1110, (11th Cir.2004) the Court of Appeals for the Eleventh Circuit discussed the

19

<u>Williams</u> case cited above from the U.S. Supreme Court.  Writing for the Court, Circuit Judge Gerald Bard Tjoflat explained:

> Our approach in this case strongly resembles that taken by the Supreme Court in <u>Williams v. United States</u>, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). In Williams, the defendant had accounts in multiple banks. The government claimed that he deposited checks drawn on his first account with the bank holding his second account, knowing full well that there were insufficient funds to cover this deposit. He was prosecuted under 18 U.S.C. § 1014, which prohibits making "false statements" to federally insured banks. The Supreme Court overturned his conviction, holding:
>
>> Although petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks served only to direct the drawee banks to pay the face value to the bearer, while committing petitioner to make good the obligations if the bank dishonored the drafts. Each check did not, in terms, make any representations as to the state of petitioner's bank balance.
>
> <u>Id</u>. at 284-85, 102 S.Ct. at 3091. The Court further held, "[I]f Congress really set out to enact a national bad check law in § 1014, it did so with a peculiar choice of language and in an unusually backhanded manner." <u>Id</u>. at 287, 102 S.Ct. at 3093. The Court concluded,
>
> Given this background-a statute that is not unambiguous in its terms and that if applied here would render a wide range of conduct vilative of federal law, a legislative history that fails to evidence congressional awareness of the statute's claimed scope, and a subject matter that traditionally has been regulated by state law-we believe that a narrow interpretation of § 1014 would be consistent with our usual approach to the construction of criminal statutes.
>
> <u>Id</u>. at 290, 102 S.Ct. at 3094.
>
> The Supreme Court's reasoning applies with equal force in the instant case. Like a check, a contract is not a factual assertion, and therefore cannot be characterized as "true" or "false." Just as a check gives its recipient the legal right to payment either from the bank or the drawer, so too a contract gives the other party the legal right either to performance or

20

compensation. While a check, by its terms, does not "make any representations as to the state of petitioner's bank balance," id. at 284-85, 102 S.Ct. at 3091, a contract does not make any representations as to a party's intention to perform instead of paying damages, or to exercise its rights under the contract. Just as a check is not "false" simply because neither the drawer nor the drawee intends that the drawee cash it, a contract is not false simply because neither party intends to enforce it. Finally, and perhaps most persuasively, just as there is no evidence that Congress intended § 1014 to be a national bad check law, displacing vast amounts of state legislation, there is no evidence that Congress intended § 1001 to be a national "false contract" law, occupying an area that has been a cornerstone of the common law for the better part of a millennium.

Id. at 1135-36 (footnote omitted).[17]

Based on the above, the Court finds that if the plaintiff contends that the issuance of the check that was later returned for insufficient funds was a separate false representation actionable under section 523(a)(2)(A), that contention should be denied. First, as a matter of law, the check was not a false representation. Second, again there is absolutely no evidence that the defendant knew the check would be dishonored or that there were not sufficient funds to cover it. The defendant's banking practices were not discussed and none of his bank statements were introduced as exhibits. Third, like the situations with Exhibit 13 and Exhibit 15, the issuance of the check did not create a new debt. The plaintiff had already given the defendant the $40,000. The issuance of the check did not cause the plaintiff to take any action in reliance on the issuance of the check.

Therefore, based on the above, as a matter of fact, and as a conclusion of law, the Court must find that was no false representation in issuing the $35,000 check on which the plaintiff could reasonably rely that would cause him damage. Consequently there was no fraud in regard to this representation, the fourth of four considered.

**Exhibit 17 – Deposit Slip**. This exhibit is a copy of the deposit slip where the plaintiff deposited the defendant's $35,000 check.

**Exhibit 18 – Receipt for Deposit**. This document is a receipt from Wachovia Bank for a deposit of $300,000 to the plaintiff's bank account. It was represented that these were the funds the plaintiff would use for the down payment on the purchase.

---

[17] In contrast, this reasoning was distinguished in In re Foxworth, Adv. Pro. No. 03-90063, 2004 WL 2044284 (Bankr. N.D. Fla. Apr 14, 2004). Those distinctions do not apply to this proceeding.

**Exhibit 19 – Business Card**.  This exhibit is a copy of Christie Taylor's business card.[18]

## IV.  Conclusions

As stated above, to prove fraud the four factors the plaintiff had to satisfy by a preponderance of the evidence were:

1.   the defendant made a false statement with the purpose and intention of deceiving the creditor;

2.   the creditor relied on such false statement;

3.   the creditor's reliance on the false statement was justifiably founded; and

4.   the creditor sustained damage as a result of the false statement.

Based on the discussion above, the Court finds that the plaintiff did not prove these elements.  Therefore the complaint is due to be denied and whatever debt the defendant owes the plaintiff is discharged.[19]

---

[18] As discussed above, Ms. Taylor was the loan officer assisting the plaintiff in obtaining a loan for the grocery purchase.  Also as discussed above, it was represented that Ms. Taylor was the defendant's sister-in-law.  The plaintiff contended that the relationship between the defendant and Ms. Taylor gave credence to the allegations of fraud.  There was no evidence presented to suggest any collusion.

[19] Because the Court finds that any debt the defendant would have with the plaintiff is dischargeable, the Court has not discussed the exact amount of whatever debt the defendant might owe the plaintiff.  However, if there is a question, the Court finds that the amount would be $25,000.  It appears that the defendant was entitled, pursuant to Exhibit 3 his agency agreement with the plaintiff, to $10,000 if he brought the plaintiff-buyer together with a seller.  He was entitled to that amount even if the sale was not completed.  He did bring the buyer and the seller together.  That amount would reduce the $40,000 to $30,000.  The plaintiff acknowledged that the defendant gave him $5,000 when the plaintiff visited the plaintiff to collect the money.  That would reduce the amount then to $25,000.

In contrast, the defendant contends that he is entitled to the whole $40,000 as that was the amount he would have earned if the sale had been completed.  His Answer to the complaint reads:

> The Plaintiff agreed to purchase the store for the amount of $690,000.00 upon financial approval.  The Plaintiff rescinded the transaction after receiving approval from the financial institution.  The Plaintiff refused to continue with the transaction after learning that the interest rate was above the rate quoted subject to credit approval.  According to the agreement signed by the Plaintiff, SALEH

22

Dated:  March 28, 2011                        /s/Benjamin Cohen
                                              BENJAMIN COHEN
                                              United States Bankruptcy Judge

BC:pb

---

ROWAID, the earnest money was forfeited due to breech [sic] of contract.  This was explained to the Plaintiff at the time of the transaction.

Answer at 1, Docket No. 4.

The defendant argues that the deal would have been completed if the plaintiff had accepted the loan represented by Exhibit 14.  He concludes that the plaintiff breached their "contract" when he refused that loan which prevented the sale from going through.  This too is not an issue the Court needs to address, and the Court is not making a finding that the defendant earned or did not earn the entire $40,000.

23